DAVID M. GIVEN (State Bar No. 142375)
NICHOLAS A. CARLIN (State Bar No. 112532)
BRIAN S. CONLON (State Bar No. 303456)
PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 - The Presidio
San Francisco, CA   94129
Telephone:   415-398-0900
Fax:            415-398-0911
Email: dmg@phillaw.com
         nac@phillaw.com
         bsc@phillaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA TAVRES, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARNES & NOBLE, INC. a Delaware corporation,<br><br>Defendant. | Case No:<br><br>**CLASS AND COLLECTIVE ACTION**<br><br>**COMPLAINT FOR AGE DISCRIMINATION**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.  Plaintiff Barbara Tavres, on behalf of herself and all others similarly situated (collectively "Plaintiffs"), alleges Defendant Barnes & Noble, Inc. ("Defendant" or "Barnes & Noble"), through its employment practices, committed wide-spread and systemic age discrimination in violation of the Age Discrimination in Employment Act, as amended ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940 *et seq*. Accordingly, Ms. Tavres brings this class and collective action to obtain remedies for this disparate treatment and disparate impact discrimination.

1

COMPLAINT FOR AGE DISCRIMINATION

2.       Despite its longstanding status as one of the nation's largest book retailers, Barnes & Noble has struggled to remain competitive in an increasingly digital and online literary marketplace. Since 1997, it has closed nearly 400 stores. In the last five years, its market value has shrunk by $1 billion. In early July 2018, Barnes & Noble fired its CEO Demos Parneros over sexual abuse claims. As an August 2019 article in the *New York Times* declared: "Barnes & Noble has been sliding toward oblivion for years."

3.       In August 2019, Barnes & Noble was purchased by the private equity hedge fund Elliott Management Corp. for $683 million—a fraction of its former market value. Elliott Management, run by billionaire venture capitalist Paul Elliott Singer, is an investment firm known for maintaining a portfolio concentrated in distressed securities, typically consisting of the debt of bankrupt or near-bankrupt companies. It is widely considered a "vulture fund." As a result of Elliott Management's purchase of Barnes & Noble, the book retailer's stock – publicly traded on the NYSE since 1993 – was delisted in August 2019.

4.       Four months before its purchase of Barnes & Noble, in April of 2019, Elliott Management also purchased the largest book retailer in the UK, Waterstones. Waterstones CEO Achilles "James" Daunt – credited in a *New York Times* article with steering the British retailer "out of a death spiral by rethinking every cranny of the company" – would take the helm at Barnes & Noble the same month Elliott Management purchased it.

5.       In an aggressive effort to reverse its fortunes, Barnes & Noble has pursued an uncompromising course of action designed to cut costs, increase sales, and revamp its public persona from that of a stale, aging retail operation to that of a fresh and exciting literary sales enterprise.

6.       A profile in *Publisher's Weekly* (the industry's leading trade publication), appearing shortly after Mr. Daunt took the top spot at Barnes & Noble, stated that he believed the book retailer's "look has grown stale." "Chain stores are exciting when they are shiny and new," he said. "But they don't age well."

7.       Barnes & Noble's strategic makeover under Mr. Daunt, according to an August 8, 2019 profile in the *New York Times*, was designed to mimic Waterstones's: "Once Mr. Daunt

commences his overhaul of Barnes & Noble, he will again try to turn a large chain into what looks and feels like a collection of independent bookstores. Again, he will do battle with a culture of stifling uniformity."

8. According to Mr. Daunt, this strategy entailed "empowering store managers and other booksellers to create stores that meet the needs of their local communities." As *Publisher's Weekly* put it, "improvement will be led by the company's booksellers." "Booksellers" is corporate-speak for Barnes & Noble's entry-level employees, whose duties entail operating cash registers, restocking empty shelves, and cleaning restrooms.

9. However much the financially-beleaguered company emphasized "bookseller" empowerment, the tailoring of stores to meet the needs of their communities, and the battle against uniformity, its cost-saving strategy coincided with and depended on the ruthless and unscrupulous purging of its workers age 40 and older in violation of federal and California anti-discrimination laws. As later explained to Ms. Tavres upon her termination—in a line almost certainly originating at the corporate communications level—Barnes & Noble was no longer interested in "book people." "Going forward," she was told, "we're only hiring sales people."

10. In its effort to avoid growing "stale" and to foster its "shiny and new" public image, Barnes & Noble determined that these older workers no longer looked the part. To accomplish this goal, Barnes & Nobel engaged in a campaign of age discrimination. It terminated its employees age 40 and older and replaced them with a younger workforce. And in doing so, Barnes & Noble violated these workers' rights to be free from age discrimination in the workplace under both federal and California law.

## THE PARTIES

11. Ms. Tavres is a U.S. citizen born in 1960 and has been 40 years of age or older at all pertinent times referenced herein. Ms. Tavres currently resides in Hayward, California and has resided in California at all pertinent times referenced herein.

12. Barnes & Noble is a Delaware corporation with its principal executive offices located at 122 Fifth Avenue, in New York, New York. Barnes & Noble is one of the nation's largest booksellers. Its business consists of the sale of trade books (hardcover and paperback

3
**COMPLAINT FOR AGE DISCRIMINATION**

titles), mass market paperbacks, children's books, eBooks and other digital content, bargain books, textbooks, magazines, gifts, café products and services, educational toys and games, music, and movies. It conducts these sales through its bookstores and online through its website located at www.barnesandnoble.com. According to documents filed with the SEC, as of April 2019, Barnes & Noble operated 627 bookstores in all fifty states and employed approximately 24,000 employees (7,000 full-time and 17,000 part-time).

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. 626(c).

14. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

15. This Court has supplemental jurisdiction over Ms. Tavres's state law claims pursuant to 28 U.S.C. § 1367 because that claim arises out of the same operative facts as her federal claims and forms part of the same case or controversy.

16. This Court has personal jurisdiction over Barnes & Noble because Barnes & Noble engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including by operating 69 stores in California and about a dozen stores in the Northern District. In addition, this Court has personal jurisdiction over Barnes & Noble because the causes of action set forth herein arise from or relate to Barnes & Noble's contacts in this forum.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Assignment in the Oakland or San Francisco divisions is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events giving rise to Ms. Tavres's claims occurred in those divisions. The action arises in the County of Alameda, which is served by the San Francisco and Oakland divisions. See Civil Local Rule 3-2(d).

///

**FACTUAL ALLEGATIONS**

18.     From 2006 to 2011, Ms. Tavres served as a Community Relations Manager ("CRM") at a Barnes & Noble bookstore located in Oakland, California. From 2011 to 2014, she served in that position at a Barnes & Noble bookstore in Emeryville, California. In her role as a CRM, Ms. Tavres was responsible for planning events and activities designed to generate goodwill for Barnes & Noble within the community in which her assigned store was located, increase store traffic, and ultimately drive sales for that store. These events and activities included book fairs, literary readings, author meet-and-greets, book club meetings, children's story times, and the like. Ms. Tavres and her CRM cohort's other key responsibilities included making institutional sales, corporate sales, and sales to educators.

19.     Ms. Tavres was a highly successful employee. She received glowing performance reviews and was consistently provided with annual raises to her base pay in recognition of her performance. Ms. Tavres was never subject to reprimand or discipline for any reason whatsoever during the period of her nearly 13-year employment with Barnes & Noble. On the contrary, she was a top performer. In her 2009-2010 performance review, her manager stated: "You have been in the top 3 stores for the past three years, and have always been a team player in assisting other stores and training new CRMs." In her 2013-2014 performance review, her manager stated: "Barb has continued to do an outstanding job in delivering institutional sales. . . . Barb is a pleasure to work with and I look forward to many more years of success. . . . Year over year Barb has delivered excellent results with her institutional sales."

20.     Effective June 29, 2014, Barnes & Noble changed the job title of its CRMs. Going forward, CRMs became known as Community Business Development Managers ("CBDMs").

21.     Notwithstanding the formal change to her job title and description, from June 29, 2014 to September 11, 2019, Ms. Tavres served as a CBDM at the same Barnes & Noble bookstore in Emeryville, California in which she had served as a CRM since 2011. Her duties and responsibilities remained largely the same.

22. Ms. Tavres continued to excel at Barnes & Noble, as reflected by her continued outstanding performance reviews. For example, in her 2015-2016 performance review, her manager stated: "Barb you have built the largest CBDM business in the district, totaling over $400K in total CBDM sales. Furthermore, you have had several sales for the store which do not directly affect your metrics [i.e., she made sales that did not count toward her sales goal]. For instance, you have had multiple bulk gift card sales in the last year, and the store nearly make [sic] gift card goal, finishing second in the district to plan, based on your strong efforts." The manager concluded: "Barbara, you have been a model for the CBDM position in our district. . . . [Y]ou had a strong year leading the CBDM business and you are a key contributor to the success of the Emeryville store."

23. In recognition of Ms. Tavres's excellent performance, in June 2016 Barnes & Noble named her the winner of its "Above & Beyond" award, stating: "Barbara Tavres has exceeded her previous year's sales every year. She is a top performer in her role. . . . Last year, she brought in almost $700,000 in sales, making her one of the top CBDMs in the region."

24. Despite her nearly 13 years of exceptional service for Barnes & Noble, on September 9, 2019, Barnes & Noble employees Phil Alexander (her District Manager) and Brandy Albright (her Store Manager) informed Ms. Tavres during a closed-door meeting in Ms. Albright's office that Ms. Tavres was being terminated effective September 11, 2019. When Mr. Alexander and Ms. Albright informed Ms. Tavres that she was being terminated, they stated that they were sorry to lose her because she was an exceptional employee and that they would be happy to give her a glowing referral, but that they had "no choice" but to "let her go." Mr. Alexander and Ms. Albright did not detail the reasons for terminating Ms. Tavres, but Ms. Tavres understood that the formal, pretextual reason for her termination was that she had failed to meet her sales goal.

25. The purported reason for Ms. Tavres's termination—i.e., that she had failed to meet her sales goal for FY 2019—given to Ms. Tavres and many similarly situated older workers required to meet such "sales goals," was designed to appear as a facially neutral means of terminating older employees. But the real reason for her discharge—and the formal and

constructive discharge of other employees similarly situated—was discriminatory animus based on age.

26. Earlier on September 9—just prior to terminating Ms. Tavres—Mr. Alexander and other management-level Barnes & Noble employees had participated in a recurring weekly teleconference. During that teleconference, Mr. Alexander informed the other participants of the following corporate directive: "Look, we're no longer hiring book people. Going forward, we're only hiring sales people." That is, consistent with this corporate directive to purge Barnes & Noble of its "book people" (which was code for older workers) and to replace them with "sales [or marketing] people" (which was code for younger workers), Mr. Alexander called his meeting with Ms. Tavres and terminated her—despite her sterling record of sales for Barnes & Noble, which over a 13-year period amounted to millions of dollars. One of Ms. Tavres's colleagues was distraught and heartbroken upon learning that Ms. Tavres was being terminated informed Ms. Tavres of the directive to rid the company of its "book people."

27. Ms. Tavres is aware of at least two younger employees who were hired to replace older employees terminated in this concerted campaign of age discrimination. Both were, at the time they were hired, in their early-to-mid 20s. Both were trained by employees age 40 years of age or older and both replaced employees 40 years of age or older. Neither had any sales experience prior to being hired as CBDMs, despite Barnes & Noble's standard job qualifications for CBDMs requiring "a minimum of 2 years of outbound sales experience."

28. The first was hired as a CBDM in or around 2016. The second was hired as a CBDM about six months to a year later and was trained by—and then replaced—Ms. Sandy Graves, another former CBDM who was age 40 or older at all relevant times, and was eventually promoted to Marketing Business Development Manager (MBDM)—a position for which Ms. Tavres was passed over about a year before she was terminated.

29. Rudy Romero, who managed Ms. Tavres's store in Emeryville, was empowered by District Manager Phil Alexander to harass, intimidate, and ultimately terminate or constructively terminate Barnes & Noble employees age 40 and older. Mr. Romero did so by, among other things, sabotaging those employees' ability to effectively do their jobs by either

interfering with their duties or mistreating their customers and clients with whom they needed to maintain professional relationships in order meet their sales goals and keep their jobs. Mr. Alexander's response to Mr. Romero's behavior in those instances was to effectively ignore it or otherwise give Mr. Romero a proverbial slap on the wrist—thereby tacitly approving of and encouraging such sabotage.

30. Ms. Tavres response to Mr. Romero's sabotage was consummately professional—she would communicate her concerns to Mr. Romero's superior, Mr. Alexander. In one such communication following a particularly unprofessional interaction between Mr. Romero and one of Ms. Tavres's important institutional clients, she summed up her concerns and described her business philosophy as follows: "I would just like to know how we can make Rudy understand that building relationships is EVERYTHING! My bottom line is: love, community and building strong relationships, which = sales."

31. Mr. Alexander's response to these two incidents was to say he would take care of it or that he would talk to Mr. Romero about it. In any event, on information and belief, Mr. Romero was not disciplined for this behavior.

32. On September 24, 2019, Ms. Tavres requested, in writing, a copy of her personnel file from Brandy Albright. Ms. Albright responded and indicated that she would "pass [the request] along to HR." Ms. Tavres has not received her personnel file. Because it has been more than 30 days since Ms. Tavres issued her written request to Barnes & Noble, Barnes & Noble has violated California Labor Code § 1198.5.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

33. On or about October 28, 2019, Ms. Tavres filed a complaint against Barnes & Noble with the DFEH (Matter No. 201910-08072728), cross-filed with the EEOC (Charge No. 555-2020-00164C). The administrative complaint asserted class and collective claims for age discrimination in employment under the ADEA and FEHA. The DFEH issued a "right to sue" notice on October 28, 2019 and Ms. Tavres received the notice on the same day. The EEOC issued a "right to sue" notice on November 15, 2019 and Ms. Tavres received the notice on

November 19, 2019. Accordingly, Ms. Tavres has exhausted her administrative remedies and this complaint is timely.

## ADEA COLLECTIVE ALLEGATIONS

34. With respect to her ADEA claims and pursuant to 29 U.S.C. § 216(b), Ms. Tavres brings this case as a collective action on behalf of herself and all other similarly situated individuals: i.e., any individual employed by Barnes & Noble in the U.S., was terminated by Barnes & Noble, was age 40 or older at the time of termination, and whose termination became effective during the Class Period (defined below). Together, these individuals were the targets and/or victims of a decision, series of decisions, policy, practice, or plan infected by discrimination.

35. Barnes & Noble has engaged in a systematic pattern and practice of intentionally discriminating against individuals, including Ms. Tavres, who are age 40 or older by terminating their employment because of their age.

36. Barnes & Noble has also implemented policies and practices that have a disparate impact on workers age 40 and older, such that workers age 40 or older are terminated from employment at a disproportionate rate compared with workers who are under 40 years old.

## FEHA CLASS ALLEGATIONS

37. With respect to her FEHA claims and pursuant to Fed. R. Civ. P. 23, Ms. Tavres brings this lawsuit as a class action on behalf of herself and all similarly situated former Barnes & Noble employees in California. The proposed class is defined as: All employees of Barnes & Noble who were actually or constructively discharged within the Class Period and who were 40 years of age or older when so discharged ("Class Members" or the "Class"). Defendant, its subsidiaries, officers, directors, managing agents and members of those persons' immediate families, the Court, Court personnel, and legal representatives, heirs, successors or assigns of any excluded person or entity are excluded from the Class.

38. The Class Period is defined as the period commencing on the date that is within one (1) year prior to the filing of this action and ending at the time this action proceeds to final judgment or settles (the "Class Period").

39. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Plaintiff further reserves the right to name additional Class representatives and to identify subclasses as necessary and appropriate.

40. **Numerosity**. The Class for whose benefit this action is brought is so numerous that joinder of all Class Members is unfeasible and impracticable. While Plaintiff does not presently know the exact number of Class Members, Plaintiff is informed and believes that the entire Class consists of potentially hundreds of individuals and that those Class Members can be readily determined and identified through Defendant's files and other documents maintained by Defendant and, if necessary, through appropriate discovery.

41. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff, like all Class Members, was discharged because of her age. Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread of unlawful conduct resulting in injury to all members of the Class.

42. **Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Issues of law and fact common to the Class include:

   a. Whether Defendant's conduct violated the ADEA's prohibition of disparate treatment discrimination;
   b. Whether Defendant's conduct violated the ADEA's prohibition of disparate impact discrimination;
   c. Whether Defendant's conduct violated FEHA's prohibition of disparate treatment discrimination;
   d. Whether Defendant's conduct violated FEHA's prohibition of disparate impact discrimination;
   e. Whether Class Members have been damaged by Defendant's actions or conduct;
   f. The effect upon and the extent of injuries suffered by the Class and the appropriate amount of compensation;

g. Whether declaratory and injunctive relief are appropriate to curtail Defendant's conduct as alleged herein; and

h. Whether Defendant acted with malice, oppression and/or fraud thereby justifying an award of punitive damages;

i. Whether Defendant acted with willfully, i.e., with knowledge or intention, thereby justifying an award of liquidated damages;

43. **Adequacy**. Ms. Tavres will fairly and adequately represent the interests of the Class and has no interests adverse to or in conflict with other Class Members. Ms. Tavres's retained counsel will vigorously prosecute this case, have previously been designated class counsel in cases in the State and Federal courts of California, and are highly experienced in employment law, class and complex, multi-party litigation.

44. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all Class Members is impracticable, and a class action will reduce the risk of inconsistent adjudications or repeated litigation on the same conduct. Further, the expense and burden of individual lawsuits would make it virtually impossible for Class Members, Defendant, or the Court to cost-effectively redress separately the unlawful conduct alleged. Thus, absent a class action, Defendant would unjustly retain the benefits of its wrongdoing and Class Members would go without redress for the illegal and reprehensible discrimination they suffered. Plaintiff knows of no difficulties to be encountered in the management of this action that would preclude its maintenance as a class action, either with or without sub-classes.

45. Adequate notice can be given to Class Members directly using information maintained in Defendant's records, or through notice by publication.

46. Accordingly, class certification is appropriate under Fed. R. Civ. P. 23.

## COUNT I

(*Disparate Treatment – Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.*)

(On behalf of Plaintiff and similarly situated individuals)

47. Plaintiff re-alleges and incorporates the above paragraphs by reference as fully set forth herein.

48. The ADEA claims herein are brought by Plaintiff and all similarly situated individuals.

49. Under the ADEA, 29 U.S.C. § 621 *et seq.*, it is unlawful for an employer to, *inter alia*, discharge any individual or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's age.

50. Throughout the liability period, Barnes & Noble has engaged in a pattern and practice of discriminating against individuals who are age 40 or older by knowingly and intentionally, through its employment practices, treating individuals who are 40 years of age or older adversely and treating individuals who are under the age of 40 preferentially.

51. As a direct and proximate result of Barnes & Noble's intentional discrimination, Plaintiff and similarly situated individuals have been discharged and otherwise discriminated against with respect to their compensation, terms, conditions, or privileges of employment because of their age.

52. Barnes & Noble's actions constitute unlawful discrimination in violation of the ADEA.

## COUNT II

(*Disparate Impact – Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.*)

(On behalf of Plaintiff and similarly situated individuals)

53. Plaintiff re-alleges and incorporates the above paragraphs by reference as fully set forth herein.

54. The ADEA claims herein are brought by Plaintiff and all similarly situated individuals.

55. Under the ADEA, 29 U.S.C. § 621 *et seq.*, it is unlawful for an employer to, *inter alia*, implement an otherwise facially neutral employment policy, practice, or procedure which has a disproportionate adverse effect on people 40 years of age or older.

56. Throughout the liability period, Barnes & Noble has used policies, practices, and procedures which have disproportionately affected employees age 40 and older. These include but are not limited to: setting sales goals for its CBDMs; arbitrarily increasing those sales goals nearly without exception year over year; denying CBDMs eligibility for commission pay by placing them on "improvement plans" for not meeting sales goals; and finally firing CBDMs for not meeting those goals. These policies, practices, and procedures are not job-related for the position at issue, not consistent with business necessity, and not based on any other reasonable factor.

57. These policies, practices, and procedures have disproportionately disparately impacted employees age 40 and older.

58. As a direct and proximate result of Barnes & Noble's policies, practices, and procedures, Plaintiff and similarly situated individuals have been discharged and otherwise discriminated against with respect to their compensation, terms, conditions, or privileges of employment because of their age.

59. Barnes & Noble's actions constitute unlawful discrimination in violation of the ADEA.

## COUNT III

(*Disparate Treatment – Fair Employment and Housing Act, Cal. Gov. Code § 12940 et seq.*)

(On behalf of Plaintiff and similarly situated individuals)

60. Plaintiff re-alleges and incorporates the above paragraphs by reference as fully set forth herein.

61. The FEHA claims herein are brought by Plaintiff and all similarly situated individuals.

62. The FEHA, Cal. Gov. Code § 12940 *et seq.*, prohibits an employer from discriminating on the basis of age.

63. Barnes & Noble is an employer covered by FEHA.

64. Plaintiff and similarly situated individuals were employees of Barnes & Noble.

65. Barnes & Noble formally and/or constructively discharged Plaintiff and similarly situated individuals.

66. Plaintiff and similarly situated individuals were age 40 or older at the time of their discharge.

67. The age of Plaintiff and similarly situated individuals was a substantial motivating reason for their discharge.

68. As a direct and proximate result of Barnes & Noble's conduct, Plaintiff and similarly situated individuals were harmed.

69. Barnes & Noble's conduct was a substantial factor in causing harm to Plaintiff and similarly situated individuals.

70. Barnes & Noble's actions constitute unlawful discrimination in violation of FEHA.

## COUNT IV

(*Disparate Impact – Fair Employment and Housing Act, Cal. Gov. Code § 12940 et seq.*)

(On behalf of Plaintiff and similarly situated individuals)

71. Plaintiff re-alleges and incorporates the above paragraphs by reference as fully set forth herein.

72. The FEHA claims herein are brought by Plaintiff and all similarly situated individuals.

73. The FEHA, Cal. Gov. Code § 12940 *et seq.*, prohibits an employer from discriminating on the basis of age.

74. Barnes & Noble is an employer covered by FEHA.

75. Plaintiff and similarly situated individuals were employees of Barnes & Noble.

76. Barnes & Noble has and had an employment policy, practice, and/or procedure that had a disproportionate, adverse effect on its employees age 40 and older.

77. Plaintiff and similarly situated individuals are age 40 and older.

78. Plaintiff and similarly situated individuals were harmed.

79. Barned & Noble's policy, practice, and/or procedure was a substantial factor in causing harm to Plaintiff and similarly situated individuals.

80. Barnes & Noble's actions constitute unlawful discrimination in violation of FEHA.

## DEMAND FOR JURY TRIAL

81. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, on behalf of herself and all others similarly situated, hereby demands a trial by jury of all claims asserted in this complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment in her favor and relief against Defendant, as follows:

(a) As to the first and second causes of action, an order certifying this case as a collective action and appointing Plaintiff and her counsel to represent Plaintiff and all others similarly situated;

(b) As to the third and fourth causes of action, an order certifying this case as a class action and appointing Plaintiff and her counsel to represent the Class;

(c) For injunctive relief restraining further acts of discrimination by Defendant;

(d) For injunctive relief reinstating Plaintiff and Class members;

(e) For declaratory relief in the form of a declaration that Defendant's employment practices as alleged herein are illegal because they discriminate on the basis of age;

(f) Back pay and front pay;

(g) Liquidated damages equal to the amount of back pay;

(h) Actual damages;

(i) Compensatory damages including, but not limited to, damages for pain and suffering;

(j) Punitive and exemplary damages;

(k) Attorney's fees and costs;

(l) Statutory penalties in the amount of $750 for violation of Cal. Labor Code § 1198.5;

(m) An injunction directing Barnes & Noble to comply with Cal. Labor Code § 1198.5 and costs and attorney's fees related thereto; and

(n) For all such other and further relief as the Court may deem just, proper, and equitable.

Dated: November 20, 2019

Respectfully submitted,

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

By /s/ David M. Given
David M. Given
Nicholas A. Carlin
Brian S. Conlon
Attorneys for Plaintiff