United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BARBARA TAVRES,
Plaintiff,

v.

BARNES & NOBLE, INC.,
Defendant.

Case No. 19-cv-07655-EMC

**FINAL PRETRIAL CONFERENCE ORDER**

## I. TRIAL DATE & LENGTH OF TRIAL

Currently, the trial remains on calendar with a start date of August 16, 2021.

Trial shall last from 8:30 a.m. to 1:30 p.m. on each day, except for Thursdays, which are dark. On all trial days counsel shall be present in the Courtroom at 8:15 a.m. to discuss any matters requiring resolution prior to commencement of trial at 8:30 a.m.

The trial shall last for approximately two weeks. Ms. Tavres shall have 20 hours to present her case (including the opening statement, closing argument, and direct and cross-examinations); B&N shall have 13 hours to present its case (including the same).

## II. WITNESSES

### A. Plaintiff

Ms. Tavres has identified the following individuals as witnesses she may call in her case-in-chief. *See* Docket No. 75 (witness list).

(1) Barbara Tavres.

(2) Yaser Soliman.

(3) Sandy Graves.

United States District Court
Northern District of California

(4) Shannon Skinner.

(5) Savannah Sauer.

(6) Phil Alexander.

(7) Tracy Vidakovich.

(8) Paul Tavres.

(9) Barbara Duterte.

(10) Kelly Tavres.

(11) Nancy Gerace.

(12) Marsha Rhynes.

(13) Kaitlin Friedman.

(14) Mary Hallford.

(15) Renee Miguel.

(16) Eric Lietzow (expert on economic damages).

(17) Stephen Francis (expert on emotional and psychological distress).

(18) Jonah Gelbach (expert for disparate impact theory).

(19) Dr. James Heckmann (expert).

Based on the time limits imposed above, as well as the Court's rulings on the motions in limine below, the Court advises Ms. Tavres to shorten her witness list. A final witness list shall be filed by August 9, 2021.

B. Defendant

B&N has identified the following individuals as witnesses it may call in its case-in-chief. *See* Docket No. 75 (witness list).

(1) Rosanne Avallone.

(2) Tanya Jerry.

(3) Gwen Jones.

(4) Brandy Albright.

(5) Phil Alexander.

(6) Tracy Vidakovich.

(7) Barbara Tavres.

(8) Savanna Sauer.

(9) Jonathan Blumenstein (expert on disparate impact theory).

(10) Dr. James Heckman (expert).

Based on the time limits imposed above, the Court shall also give B&N an opportunity to shorten its witness list. A final witness list shall be filed by August 9, 2021.

## III. MOTIONS IN LIMINE

Ms. Tavres has not filed any motions in limine; B&N has filed four.

A. Defendant's Motion in Limine No. 1 (Docket No. 65)

B&N's first motion in limine relates to a declaration from one of Ms. Tavres's witnesses, Mr. Soliman. *See* Goldberg Decl., Ex. 1 (Soliman Decl.). The declaration contains information that supports Ms. Tavres's disparate treatment claim. In its motion in limine, B&N seeks to exclude the Soliman declaration. It further seeks to exclude evidence related to Ms. Vidakovich's alleged comments to Mr. Soliman.

1. Soliman Declaration

The Soliman declaration is, as B&N contends, hearsay. That being said, Mr. Soliman will be testifying as one of Ms. Tavres's trial witnesses; therefore, Ms. Tavres need not rely on the Soliman declaration.

Ms. Tavres notes that she might still use the Soliman declaration to refresh Mr. Soliman's recollection while he is on the stand testifying. However, the declaration would not be so admitted as evidence for the jury to review.[1]

Ms. Tavres also asserts that the Soliman declaration may become admissible under Rule 801(d). Under that rule, a prior consistent statement is not hearsay if the declarant testifies and is subject to cross-examination about the prior consistent statement and the prior statement "is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's

[1] At the pretrial conference, Ms. Tavres withdrew her argument that the declaration would be admissible as a recorded recollection under Rule 803(5).



United States District Court
Northern District of California

credibility as a witness when attacked on another ground . . . ." Fed. R. Evid. 801(d)(1)(B). It is possible that the declaration could be admitted under Rule 801(d) but the Court reserves ruling as admissibility under the rule will turn on what happens at trial.

2. Evidence Related to Ms. Vidakovich's Alleged Comments

Because Mr. Soliman will be testifying live at trial, his declaration is less consequential. The more important issue is whether the Court should bar Mr. Soliman from testifying at trial about Ms. Vidakovich's alleged comments. Ms. Vidakovich's alleged comments are not hearsay because they qualify as statements of a party-opponent. *See* Fed. R. Evid. 801(d)(2) (noting that the following constitutes the statement of a party-opponent – *e.g.*, the statement is offered against an opposing party and the statement was made by the opposing party's "agent or employee on a matter within the scope of that relationship and while it existed"). B&N asserts still that Ms. Vidakovich's statements are not relevant because Ms. Vidakovich was not a decisionmaker with respect to Ms. Tavres – *i.e.*, she did not "contribute[] to Plaintiff's performance reviews or goals," and she did not have "the authority to discipline [or] terminate her." Mot. at 2. Ms. Tavres does not dispute that Ms. Vidakovich was not within her "chain of command." However, she argues that, under a cat's paw theory, Ms. Vidakovich did not have to be the actual decisionmaker so long as she still exerted influence over the decisionmaking. *See Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 115-16 (2004) (noting that the Supreme Court seems to have endorsed the cat's paw theory and that all but one of the federal circuit courts have adopted it or referred to it approvingly; "[w]e have no doubt that California law will follow the overwhelming weight of federal authority and hold employers responsible where discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory animus"); *DeJung v. Superior Court*, 169 Cal. App. 4th 533, 551 (2008) (noting that California courts have adopted the cat's paw theory).

The Court shall wait to see how Mr. Soliman testifies at trial. If he testifies as he did in his declaration, then Ms. Tavres will have established the predicate for relevance because there will be a factual basis for her contention that Ms. Vidakovich exerted influence. Mr. Soliman states in his

declaration that Ms. Vidakovich put pressure on him to put pressure on Mr. Alexander to fire Ms. Tavres. He also indicates in his declaration that Ms. Vidakovich was in a position to exert influence because, even though District Managers were not within her direct chain command, she still played a role with respect to District Managers (as did he). *See, e.g.*, Soliman Decl. ¶ 9 (testifying that sales goals are set by the finance department at the home office, "who would share those goals with Ms. Vidakovich, who would then edit and/or approve those goals before sending the sales goals figures along to DMs, CBDMs and MBDMs"); Soliman Decl. ¶¶ 8-9 (testifying that he partners with District Manager to support them with business development and to liaise between District Managers and corporate headquarters and that his superior is Ms. Vidakovich). If such relevance is established, Rule 403 would not be a bar.

B. Defendant's Motion in Limine No. 2 (Docket No. 66)

In this motion in limine, B&N moves to exclude testimony by three of Ms. Tavres's experts: Mr. Lietzow (economic damages), Dr. Francis (emotional and psychological distress), and Dr. Gelbach (disparate impact theory).

1. Mr. Lietzow (Economic Damages)

Mr. Lietzow is Ms. Tavres's expert on economic damages; he was retained to calculate Ms. Tavres's lost wages.

B&N largely challenges Mr. Lietzow's qualifications – *e.g.*, (1) "he has no experience calculating damages for employment age discrimination matters" (as opposed to wage-and-hour matters); (2) he "has only acted as a testifying expert for damages calculations for a single plaintiff case on one occasion" (as opposed to a class action); (3) he has "limited experience calculating back and front unpaid wages"; (4) he does not "have any specialized expertise in the bookstore industry or the retail business development space"; (5) he does not have "experience factoring in the impact of the pandemic"; and (6) he did not "consider Plaintiff's personal health and its impact on her ability to work." Mot. at 6.

Ms. Tavres persuasively argues that the motion to exclude Mr. Lietzow lacks merit. For example, as a general matter, "lack of particularized expertise goes to the weight accorded [an expert's] testimony, not to the admissibility of [his] opinion as an expert." *United States v.*

*Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993) (upholding district court's ruling that expert "was sufficiently qualified to give her opinion of whether there was a substantial likelihood that Jane would suffer emotional trauma from testifying in the courtroom in the presence of the defendant," even though she admitted in cross-examination that "she was not an expert on the trauma a child would face from testifying in court or testifying on a two-way closed circuit TV"; although "she had no particularized expertise on the subject of child testimony through closed circuit television, she had considerable experience working with the Navajo tribe and with sexually abused children as a children's mental health specialist"). *Compare, e.g., Goodell v. Soledad Unified Sch. Dist.*, No. 19-cv-06196-VKD, 2021 U.S. Dist. LEXIS 115426, at *18 (N.D. Cal. June 21, 2021) (stating that "defendants have failed to demonstrate that Dr. Schreibman is qualified to offer reliable opinion testimony regarding PTSD based on her 'general familiarity' and awareness of that condition"), *with In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2016 U.S. Dist. LEXIS 179487, at *18 (N.D. Cal. Sep. 14, 2016) (finding expert qualified to opine on whether defective car infotainment system was a safety hazard even though he had not worked specifically with automobiles).

2. Dr. Francis (Emotional and Psychological Distress)

Dr. Francis is Ms. Tavres's expert on emotional and psychological distress; as reflected in his expert reports, he is a licensed psychologist. He was retained to do an independent psychological examination of Ms. Tavres. He conducted two examinations, one in May 2020 and then an "update" in March 2021.

Similar to above, B&N moves to exclude Dr. Francis's testimony on the basis of his qualification. For example: (1) The majority of Dr. Francis's work experience has "focuse[d] on chronic pain and psychology or head injuries"; (2) "[h]e has never qualified as an expert in a civil employment case"; and (3) "he is not a medical doctor qualified to consider the impact of her preexisting conditions and medications." Mot. at 6-7.

As above, Ms. Tavres argues persuasively why Dr. Francis's testimony should not be excluded. Again, lack of particularized expertise is not dispositive. *See, e.g., El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 U.S. Dist. LEXIS 129997, at *8 (S.D.N.Y. Aug. 2, 2019)

(rejecting defendant's argument that expert was not qualified to give an opinion on plaintiff's mental condition and its cause because he had no training or experience in forensic psychology applicable in the employment context; adding that "no courts in the Second Circuit appears to have drawn [a] distinction [between clinical and forensic psychology] or used it as a basis to exclude a psychologist's testimony"). Moreover, Dr. Francis does not have to be a medical doctor to opine about causation of her mental (as opposed to physical) condition. *See, e.g.*, *Allen v. Am. Cyanamid*, No. 11-CV-0055, 2021 U.S. Dist. LEXIS 53183, at *31 (E.D. Wis. Mar. 22, 2021) (holding that defendants' psychiatrist who opined that "plaintiffs do not have psychological disorders or deficiencies that can be attributed to ingestion of lead during childhood" was admissible; "[a]s a trained clinical psychologist of more than twenty years' experience, she is amply qualified to conduct a psychological examination and to opine on a person's psychological state and the factors affecting it"); *Hoyland v. McMenomy*, No. 14-cv-2977 (SRN/JSM), 2016 U.S. Dist. LEXIS 59938, at *10 (D. Minn. May 5, 2016) (holding that "Dr. Ferrarese is a qualified psychologist who has treated [plaintiff] for years" and that "[h]is opinions about [plaintiff's] injuries and their cause will assist a jury in deciding issues such as damages"); *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 692 (E.D. Mich. 2004) (finding expert "properly qualified to testify as [plaintiff's] treating psychologist"; adding that expert's "opinion about the psychological problems Mr. Rogers experienced following the accident and during his course of therapy and about the cause of those problems is reliable").

3. <u>Dr. Gelbach (Disparate Impact Theory)</u>

Finally, Dr. Gelbach is Ms. Tavres's expert, primarily opining on her disparate impact theory.[2]

B&N challenges both Dr. Gelbach's qualifications and the reliability of his opinions.[3] On

---

[2] As the Court acknowledged at the hearing, Dr. Gelbach's testimony could also be relevant to the disparate treatment claim, but Ms. Tavres cannot rely on disparate impact alone to prove her disparate treatment claim – *i.e.*, she must prove a discriminatory intent for her disparate treatment claim.

[3] To the extent B&N suggests that an individual cannot bring a disparate impact claim in an individual suit, as opposed to a class action, the Court does not agree. *See Lasso v. Woodmen of World Life Ins. Co.*, 741 F.2d 1241, 1245 (10th Cir. 1984) (rejecting "defendant's argument that a

United States District Court
Northern District of California

qualifications, B&N argues that Dr. Gelbach has not been an economics professor since 2010 and does not have experience in employment law. *See* Mot. at 7; *see also* Mot. at 1 (arguing that Dr. Gelbach has "no *recent* nor *relevant* expertise in statistical analysis or econometrics") (emphasis added). Regarding reliability, B&N asserts that Dr. Gelbach improperly made conclusions that there was statistically significant evidence at the 10% level, not the 5% level; it also argues that Dr. Gelbach also improperly used some tests (the Barnard test as well as the Statistical Inference test) that had never been cited in employment cases. *See* Mot. at 4-5.

The qualifications challenge is problematic for reasons similar to those stated above. Dr. Gelbach is qualified to testify. Regarding reliability, Ms. Tavres argues that simply because ".05 is '*generally recognized* as the point at which statisticians draw conclusions from statistical data' (*see Contreras v. City of Los Angeles*, 656 F. 2d 1267, 1273 (9th Cir. 1981), emphasis added) does not mean that .10 [used by Dr. Gelbach] is never permitted or is not also generally recognized by statisticians." Opp'n at 7[4]; *see also High-Tech*, 2014 U.S. Dist. LEXIS 47181, at *61 (noting that statistical significance at the 1%, 5%, and 10% levels "are the 'conventional' levels statisticians typically use"). However, the Court shall not allow Dr. Gelbach to express opinions where the statistical significance is at a higher level such as 41%. *See* Gelbach Rpt. ¶ 18(e) (discussing the

disparate impact claim may not be asserted in a private, non-class action").

[4] In *Contreras*, the Ninth Circuit noted:

> A .05 level of statistical significance indicates that the demonstrated relationship between the variables would occur in a random sample five times out of one hundred and is generally recognized as the point at which statisticians draw conclusions from statistical data." *White v. City of San Diego*, 605 F.2d 455, 460 (9th Cir.1979). In other words, the existence of a .05 level of statistical significance means that the disparate results of a pre-employment screening device would be the product of chance only one time in twenty. Nineteen times in twenty the disparate results would be the product of some discriminatory tendency of the screening device.

*Contreras*, 656 F.2d at 1273 n.3; *see also In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 U.S. Dist. LEXIS 47181, at *45-46 n.22 (N.D. Cal. Apr. 4, 2014) (stating that "'[c]onfidence intervals . . . are statistical estimates of the range within which there can be reasonable confidence that a correlation or prediction is not the result of chance variability in the sample on which the correlation or prediction was based'" – *e.g.*, "[a] 95% confidence interval reflects a statistical significance level of 5%").

United States District Court
Northern District of California

Barnard test). At that level, reliability is highly debatable and far outside the 95% confidence interval typically used by statisticians. At the very least, it is barred under Rule 403.

At the pretrial conference, the dispute related to Dr. Gelbach also gave rise to questions about the viability of Ms. Tavres's disparate impact claim. Ms. Tavres asserted that she had a disparate impact claim based on (1) her termination and (2) the withholding of her commissions. The disparate impact claim based on the termination is highly problematic. Ms. Tavres admitted at the conference that she was not terminated simply because of a facially neutral policy (*i.e.*, a failure to meet sales goals); rather, she was terminated (allegedly) because the relevant decisionmakers made a discretionary decision to terminate her when she failed to meet her sales goals but they did not do the same to the younger Ms. Sauer when she failed to meet her sales goals.[5] This is not a disparate impact claim based on a universal application of a neutral rule, but rather a disparate treatment claim based on the discriminatory exercise of discretion in applying a neutral rule. Moreover, evidence introduced to establish a disparate impact claim, buried in the context of a disparate treatment claim, will likely engender jury confusion and is thus additionally barred under Rule 403.

As for the disparate impact claim based on the withholding of commissions (for failure to meet sales goals), the Court shall not dismiss it at this time as Ms. Tavres here has identified a facially neutral policy that was applied to all. That being said, there are serious questions as to whether there is sufficient evidence to support the claim. At the very least, there seems to be an obvious business justification for basing commissions on sales above a prescribed goal. As the Court indicated at the hearing, it would not be surprising if B&N were to move for judgment as a matter of law if Ms. Tavres fails to rebut B&N's expected assertion of business justification. Furthermore, it is unclear what the damages are from such disparate impact claim since the result appears not to have been termination but at best loss of commissions the measure of which seems unclear.

[5] At the conference, Ms. Tavres explicitly stated that management made decisions on what to do when an employee failed to meet sales goals *on a case-by-case basis*. She noted that Ms. Sauer, who was not age 40 or over, was not terminated after she failed to meet her sales goals.

C. Defendant's Motion in Limine No. 3 (Docket No. 67)

In the third motion in limine, B&N makes two requests.

1. Elliott Management Corp.

The first request concerns a company Elliott Management Corp. ("Elliott"). B&N asks the Court to bar Ms. Tavres from (1) identifying Elliott specifically as the acquiring company and (2) referring to Elliott as a "vulture fund." *See* Mot. at 4 (asserting relevance objection as well as Rule 403 objection). Ms. Tavres does not object. *See* Opp'n at 2 n.1. Accordingly, this part of the motion in limine is granted.

2. Mr. Romero

The second request made by B&N relates to Mr. Romero, who was previously the Store Manager at the Emeryville store where Ms. Tavres was based. According to Ms. Tavres, Mr. Romero treated her and other employees abusively (in particular, women age 40 and over), and she participated in an internal investigation into Mr. Romero's conduct, after which he was ultimately terminated for misusing gift cards. Ms. Tavres maintains that Mr. Alexander, her direct supervisor, did not promote her and/or terminated her because of her actions taken against Mr. Romero. She asserts that Mr. Romero and Mr. Alexander were close friends, and thus a vindictive motive can be ascribed to Mr. Alexander.

In the motion in limine, B&N asks the Court to exclude all evidence related to Mr. Romero's conduct because his employment with B&N ended in 2016 – "almost two years prior to the alleged discriminatory failure to promote [in September 2018] and over three years before her separation [in September 2019]." Mot. at 3. B&N predicates its motion on relevance as well as Rule 403 grounds (*e.g.*, unfairly prejudicial, undue waste of time, potential confusion for the jury).

The Court agrees with B&N. The evidence has minimal probative value, if any. It is difficult to infer retaliatory motive when so much time has passed between the protected conduct in 2016 and the failure to promote in 2018 and termination in 2019. *Compare Gordon v. Hughes*, No. 2:13-CV-01072-JAD-GWF, 2015 U.S. Dist. LEXIS 45939, at *4-5 (D. Nev. Apr. 8, 2015) (in discussing claim for retaliation, finding gap of three months sufficient to support inference of causation between protected activity and adverse act), *with Manatt v. Bank of Am., NA*, 339 F.3d



United States District Court
Northern District of California

792, 802 (9th Cir. 2003) (finding gap of nine months insufficient). This is especially true given that Mr. Alexander had plenty of time and opportunity to take adverse action against Ms. Tavres before 2018 and 2019 (*e.g.*, by giving a negative performance review). Yet there is no evidence that he did so. Furthermore, the retaliatory motive is predicated on proof that Mr. Romero and Mr. Alexander were close friends. This would require a mini trial within a trial about their relationship, a potentially confusing sideshow. These problems substantially outweigh any minimal probative value of the evidence. Thus, the evidence is barred under Rule 403.

D. Defendant's Motion in Limine No. 4 (Docket No. 68)

In its final motion in limine, B&N asks the Court to bifurcate the case into liability and (if necessary) damages proceedings. B&N also asks the Court to bar Ms. Tavres from introducing any damages-related evidence into the liability portion of the case.

The Court shall not bifurcate liability and damages, with one exception – *i.e.*, evidence related to B&N's financial condition shall not be presented to the jury unless the jury determines that punitive damages are warranted. If that occurs, the second phase will be very short. The parties agreed to meet and confer about the evidence to be presented in that phase.

## IV. EXHIBITS

Based on the Court's rulings above (including but not limited to time limits), and the parties' representation that a further meet and confer on exhibits would be fruitful, the Court directs the parties to revisit their exhibit lists and meet and confer. Final exhibit lists shall be filed by August 9, 2021. The Court provides some guidance for the parties below.

A. Plaintiff's Exhibits

- To the extent B&N has raised authentication objections to Ms. Tavres's exhibits, these should be worked out by the parties.
- The relevance and Rule 403 objections to Exhibit 5 are overruled. Ms. Tavres's performance prior to FY2019 (May 1, 2018-April 30, 2019) is relevant since she has a claim for failure to promote in September 2018. Moreover, even though her performance immediately prior to the alleged termination/constructive discharge in September 2019 may be the most important for her termination/constructive

United States District Court
Northern District of California

discharge claim, that does not mean that her past performance is entirely irrelevant. Ms. Tavres should be able to address how she functioned as a Community Business Development Manager, a position that was introduced in 2014 in recognition of a shift to a more sales-focused job.

- The objection to Exhibit 21 is sustained in light of the Court's ruling on evidence related to Mr. Romero.
- For Exhibit 29, it appears that Ms. Tavres provided a copy of the wrong document. Based on her representation at the conference as to the correct Exhibit 29, the document (a Facebook posting) appears relevant – *i.e.*, the document is probative of whether she was constructively discharged.
- Regarding Exhibit 30, the letter from Ms. Tavres's customer appears relevant – *i.e.*, it is probative of whether she was constructively discharged. However, the parties indicated that there may be some utility to meeting and conferring about the document to see if they can reach a stipulation which would obviate the need to rely on this and similar documents.
- The trial subpoena recently issued by Mr. Tavres for Ms. Sauer's personnel file and wage statements shall not be enforced. Ms. Tavres should have pursued this evidence during discovery if she intended to rely on it at trial.

B. Defendant's Exhibits

- Performance reviews or documents similar to performance reviews will likely be admissible so long as B&N can lay the foundation for the business records exception. *See* Fed. R. Evid. 803(6) (hearsay exception for "records of a regularly conducted activity").
- Regarding Exhibit 207, the police report appears relevant (*i.e.*, to corroborate Mr. Alexander's testimony that his computer was stolen, which presumably would account for the unavailability of documents that he would otherwise have in his possession, custody or control). The document also meets the hearsay exception for public records. *See* Fed. R. Evid. 803(8).

- Hearsay objections that present closer calls relate to the emails exchanged between Ms. Tavres and her supervisors. Any email authored by Ms. Tavres is not hearsay because it is the statement of a party-opponent. *See* Fed. R. Evid. 801(d)(2). However, emails authored by B&N supervisors may or may not be hearsay, depending on whether they are being offered for the truth of the matter asserted in the emails or whether they fall under the business records exception. Moreover, if there is an exchange of emails, the admissibility of Ms. Tavres's email may require admission of earlier emails to provide complete context. The parties shall meet and confer to resolve evidentiary disputes based on the Court's guidance.
- The report of B&N's expert (Jonathan Blumenstein) and his CV are hearsay, *See* Exs. 209-10, but that does not preclude the expert from testifying about his opinions on the stand.

## V. USE OF DISCOVERY RESPONSES

In Appendix 3 of the parties' joint pretrial conference statement, they have identified the discovery responses on which they intend to rely at trial. Ms. Tavres has objected to one deposition excerpt (from her own deposition). *See* Jt. PTC St., App. 3, Ex. 4 (Tavres Depo. at 268). The excerpt is provided below.

///

///

///

///

///

///

///

///

///

///

///

Go ahead.
MR. GOLDBERG: I'll rephrase. Your sales goal for fiscal year 2020 of $607,339.45 is less than your sales goal of over $800,000 in fiscal year 2019, correct?
THE WITNESS: Yes.
BY MR. GOLDBERG:
Q. So, would it be fair to say that Barnes and Noble was trying to account for a change in the market?
MR. ERLEWINE: I'm sorry. Was that -- can you repeat that question please?
MR. GOLDBERG: Sure. Would it be fair to say that because your sales goal had been reduced, that Barnes and Noble was trying to take account of your actual sales from 2019 in setting your fiscal 2020 sales goal?
MR. ERLEWINE: Objection. It calls for speculation, and it lacks foundation.
MR. GOLDBERG: You can answer.
Do you have any knowledge?
THE WITNESS: My answer to this -- I have two answers. When I saw this goal I was pleased that they dropped it from 816,000. The second answer to my question is I don't know what

As indicated by the above, Ms. Tavres has objected that one of the questions calls for her to speculate and/or lacks foundation. Although it is a fair point that Ms. Tavres cannot read into what was in B&N's mind, the evidence is admissible. Ms. Tavres can testify as to her knowledge or understanding of the situation as it relates to her state of mind.

## VI. JURY INSTRUCTIONS

The Court will address the jury instructions in a separate order. The Court intends to file proposed jury instructions and give the parties an opportunity to raise objections.

## VII. JURY VERDICT FORM

Similar to above, the Court will address the verdict form in a separate order and will give

the parties an opportunity to raise objections. The Court is not inclined to give a detailed special verdict form.

## VIII. JURY VOIR DIRE

The jury office shall issue a general questionnaire to potential jurors prior to trial. The parties shall have an opportunity to review the responses prior to jury selection. To the extent the parties wish to ask additional questions (the parties have jointly submitted proposed voir dire questions), they will be given an opportunity to conduct an in-person voir dire on the day of jury selection. The Court will lead initial in-court voir dire and then allow each party 30-40 minutes of attorney led voir dire.

The Court will abide by social distancing measures and is likely to require that all participants be masked. Witnesses will be provided with a transparent mask.

The Court intends to seat eight (8) jurors. The Court will allow remote witness testimony where warranted. The parties are to coordinate with the Courtroom Deputy Clerk and the Court's IT Department and shall agree on the process for document-handling via remote testimony (*e.g.*, witness binder sent in advance, Box.com document repository, etc.).

**IT IS SO ORDERED**.

Dated: July 26, 2021

EDWARD M. CHEN
United States District Judge